IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-00641-MEH

GILLIAN DUNNING,

    Plaintiff,

v.

JEFFERSON COUNTY SCHOOL DISTRICT R-1, and
BRIAN CONNER in his individual capacity,

    Defendants.

## ORDER

**Michael E. Hegarty, United States Magistrate Judge**.

    Plaintiff Gillian Dunning ("Dunning") asserts one claim against Defendant Jefferson County School District R-1 ("School District") for breach of contract and two claims against both the School District and Defendant Brian Conner ("Conner") (together, "Defendants") for procedural due process violations. ECF 1. Defendants have filed the present motion to dismiss ("Motion"), seeking dismissal of all claims against them, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 9. The Motion is fully briefed, and the Court finds that oral argument would not materially assist it in its adjudication. As set forth below, this Court grants in part and denies in part the Motion.

### FACTUAL BACKGROUND

    The following are factual allegations (as opposed to legal conclusions, bare assertions, or conclusory allegations) made by Dunning in her Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The School District and the Jeffco Educational Support Professionals Association ("JESPA") are parties to the Collective Bargaining Agreement ("CBA"). ECF 9-1. The CBA affords members of the bargaining unit, such as Dunning at the time of her employment, certain job protections. *Id*. at 6; ECF 1 at 3. For disciplinary actions, the CBA required bargaining unit members be entitled to "just cause" and "due process" protections from the School District. ECF 9-1 at 25-26.

Dunning was hired as a Restorative Practices Liaison ("RPL") at Oberon Middle School ("Oberon"), a member of the School District, for the 2019-20 school year. *Id*. at 3, 5. Conner is (and was at all times of the events alleged) the principal at Oberon. *Id*. at 3. As Oberon's principal, Conner supervised Dunning in her RPL role. *Id*.

In the spring of 2020, amidst concerns of the COVID-19 pandemic, many in the School District expressed financial fears. *Id*. at 6. After consideration, the School District advised principals to "contemplate two budget scenarios: Plan A, under which there would be no cuts to employee ranks at the school level; and Plan B, under which there would very likely be reductions-in-force that impacted schools." *Id*. at 6-7.

During this time Conner completed Oberon's budget, which contemplated $244,570 more than the 2019-20 budget. *Id*. at 6. Conner met with Diane Hamilton, a financial adviser, to review Oberon's budget for the 2020-21 school year. *Id*. at 6. Hamilton expressed concerns over declining student enrollment, which would lead to less funding for Oberon. *Id*. Hamilton encouraged Conner to save existing employees by budgeting less for substitute teachers, leaving unfilled positions vacant, and "avoid making . . . firing decisions until August 2020." *Id*.

Conner first notified Dunning of her termination during a face-to-face meeting on May 5, 2020. *Id*. at 7. Conner explained Oberon's 2020-21 financial budget could not fund her position.

2

*Id*. The RPL role and her employment were to be terminated at the end of the 2019-20 school year. *Id*. On or around May 7, 2020, Conner again notified Dunning via letter, explaining once more that the budget drove the decision. *Id*. Conner's termination decision was finalized and approved by the School District's Board of Education ("Board") in June of 2020. *Id*. at 2.

On May 11, 2020, Dunning emailed Conner asking about other employment opportunities at Oberon. *Id*. at 7-8. Connor told Dunning about two open paraprofessional positions and that she needed to apply to be considered. *Id*. at 8. Dunning went about obtaining recommendation letters, one from Oberon's assistant principal, Brandon Rowland. *Id*. In his recommendation letter, Rowland wrote that Dunning's termination was due to "'an unprecedented crisis associated with the Coronavirus.'" *Id*. Before the start of the 2020-21 school year, Dunning applied for several positions in the School District. *Id*. On or about August 13, 2020, Oberon posted an advertisement for a regular instructional paraprofessional position. *Id*. at 9. Conner did not ask her to apply, and the position remained unfilled for the 2020-21 school year. *Id*. The Complaint does not explain if this is the same position that was discussed with Conner on May 11, 2020.

Throughout the 2020-21 school year, the School District "posted over 300 job advertisements[.]" *Id*. Dunning claims she "was qualified for all of them" and that seven were "substantially identical to the one Dunning had at Oberon." *Id*. Though she applied to various positions, the School District did not offer her any of them. *Id*.

During the summer of 2020 and throughout the 2020-21 school year, the School District and Oberon adopted financial plans. *Id*. at 8-9. On June 17, 2020, the Board adopted a budget similar to Plan A which "avoided staff cuts at the school level." *Id*. at 8. In response to this, JESPA filed a grievance on Dunning's behalf, concerned she was not terminated for "legitimate reasons." *Id*. The Board revised Oberon's 2020-21 budget again in November, allocating another $135,443

3

to the school. *Id*. at 9. Dunning alleges that the budget concerns were not a legitimate reason for termination based on these increases. *Id*.

Dunning argues the School District breached the CBA because she was discharged without "just cause" and "contractual due process." *Id*. at 10. Purportedly, the Board failed to act "pursuant to the . . . retained management rights," and "could have transferred Dunning into a different position[.]" *Id*. Dunning maintains her termination required a "lack of work or other legitimate reasons." *Id*. at 4. As alleged, she never experienced a lack of work or a day off during the 2019-20 school year. *Id*. at 5.

Dunning brings her due process violation claims against both Defendants pursuant to 42 U.S.C. § 1983. ECF 1 at 11. Dunning brings her breach of contract claim against the School District. *Id*. at 10. Dunning requests relief of actual economic damages, compensatory damages, attorney fees, costs of this action, appropriate equitable relief, and other relief as justice requires. *Id*. at 12.

## **LEGAL STANDARDS**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare

assertions, or merely conclusory. *Id.* at 680. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1192. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

# DISCUSSION

Defendants seek dismissal of all claims. On the procedural due process claims, Defendants argue that Dunning fails to allege a due process violation and Conner enjoys qualified immunity. Concerning the breach of contract claim, the School District argues that Dunning does not establish failure to perform pursuant to the CBA. The Court begins by evaluating whether Plaintiff has plausibly pleaded her breach of contract claim.

## I. Breach of Contract Claim

Under Colorado law, to prove a breach of contract claim, a plaintiff must establish the following elements: (1) the existence of a contract; (2) plaintiff's performance or some justification for nonperformance; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). The School District claims Dunning cannot prove failure to perform under the CBA since she cannot identify a specific provision that was violated. As an initial matter, Plaintiff argues that the Court cannot interpret the provisions of the CBA at this stage. The Court disagrees.

In Colorado, courts may interpret contractual provisions as a matter of law. *Level 3 Communications, LLC. v. Liebert Corp.*, 535 F.3d 1146 (10th Cir. 2008) (explaining that under Colorado law, courts must examine contractual terms and accept to determine the intent of the parties). When interpreting contractual terms, the instrument's language must be assessed "in harmony" with the plain meaning of the words. *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005); *see also Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002) (finding that "strained constructions should be avoided"). Courts must "examin[e] the entire instrument, and not . . . view[] clauses or phrases in isolation." *Allstate Ins. Co.*, 52 P.3d at 819. The contract's purpose, its subject matter, and the parties' understanding of

6

the contract when it was created are into consideration to understand a term. *Total Petroleum, Inc. v. Farrar*, 787 P.2d 164, 167 (Colo. 1990) (quoting *Lorenzen v. Mustard's Last Stand, Inc.*, 196 Colo. 265 (Colo. 1978)).

When determining a contractual term's meaning, courts must decide if it is ambiguous. *East Ridge*, 109 P.3d at 974. A term is ambiguous "if it is fairly susceptible to more than one interpretation." *Id*. (quoting *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo.1996)). Courts may consider parol evidence if terms are ambiguous. *Id*. However, "[t]he language of the contract itself controls the determination of whether certain extrinsic evidence is relevant." *Id*. (quoting *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1236 (Colo.1998)). The parties' conduct before the controversy arose may also be examined to interpret the term. *Id*. at 975 (quoting *Town of Estes Park v. N. Colo. Water Conservancy Dist.*, 677 P.2d 320, 327 (Colo.1984)). If unambiguous, courts can decide a term's meaning without considering extrinsic evidence. *Id*. The Court begins its analysis of the breach of contract claim by examining whether Article 10's "Due Process and Just Cause" provision is ambiguous. It then will address Article 2's "legitimate reason" terminology.

Here, the CBA is an agreement "made and entered into by . . . the [] School District . . . and [JESPA]." ECF 9-1 at 6. "The purpose of this Agreement is to set forth the wages, hours, terms, and conditions of employment . . . [T]his Agreement defines the mutually agreed upon rights and duties of the parties and provides a structure of resolving conflicts[.]" *Id*. Part of Dunning's breach of contract claims rests on the "Due Process and Just Cause" provision of Article 10, asserting that her discharge was subject to the provision. ECF 1 at 10. Article 10 states:

> 10: Corrective Action
>     10-1: Due Process and Just Cause
>         10-1-1: Employees are entitled to due process and just cause whenever the [School] District exercises its right discipline or discharge employees.

> 10-1-2: Due Process includes the following rights:
>> 10-1-2-1: Reply: the right to confront and discuss the grounds for potential discipline in a fact-finding meeting before the decision to issue discipline is made.
>> 10-1-2-2: Notice: the right to be notified of a corrective action or adverse evaluation meeting two (2) workdays prior to holding the meeting. While keeping in mind considerations of retaliation or sabotage, employees should be told of the meeting topic so they can prepare.
>> 10-1-2-3: Representation: the right to have a JESPA representative in attendance at a fact-finding meeting when corrective action or an adverse evaluation is delivered. When an employee has had adequate notice and time to arrange for representation, the administrator will not be obligated to allow the employee to stop a meeting to seek representation.
>> 10-1-2-4: Appeal: the right to grieve adverse action as outlined in Article 12
>
> 10-1-3: Just Cause includes the following rights:
>> 10-1-3-1: Adequate Warning: employees will be informed of the rules and policies that may result in corrective action.
>> 10-1-3-2: Reasonable Rules: rules and policies must not be arbitrary, capricious, or discriminatory.
>> 10-1-3-3: Investigation: prior to issuing corrective action, administration shall conduct a fair, consistent, and thorough investigation in order to determine whether the employee did in fact violate or disobey a rule or policy.
>> 10-1-3-4: Proof: the greater weight of all the evidence shall support proof of infraction.
>> 10-1-3-5: Equal Treatment: all rules, policies and penalties will be applied evenhandedly without discrimination.
>> 10-1-3-6: Penalties: the corrective action administered shall adhere to progressive process outlined in Article 10.

ECF 9-1 at 25-26.

Interpreting Article 10 as a matter of law, the Court finds that its provisions are inapplicable to Dunning's termination. Read plainly, Article 10 is applicable when the School District is "exercis[ing] its right to discipline or discharge employees." ECF 9-1 at 26. When examining the CBA as a whole, it becomes evident that a discharge is only bound to a disciplinary proceeding. Article 2 of the CBA states:

> The authority of the [School] District to hire, transfer, promote, assign or retain employees; to suspend, demote or ***discharge employees or take other disciplinary action*** for cause; ***to terminate*** or otherwise relieve employees from duty for lack of work or other legitimate reasons[.]

Article 2-2-2. *Id*. at 11 (emphasis added). This explicit delineation between terminations and discharges show that these are two separate actions. As such, the Court finds that a discharge applies only in the context of disciplinary action.

Dunning alleges that her termination was a "discharge," and she is entitled to the rights stated in Article 10. Yet, the Complaint does not state that this resulted from disciplinary actions by the School District. Consistent with the interpretation of the CBA, her allegations do not establish that she was entitled to the due process and just cause procedures laid out in Article 10. In fact, she maintains that she was terminated for reasons that were wholly different from disciplinary actions. Therefore, Article 10 does not apply to Dunning, and she is unable to state a claim based on its provisions.

However, Dunning does state a claim for a breach of contract for her "termination" based on "legitimate reasons." In this case, there is no detail as to what a "legitimate reason" may be. The CBA does not define "legitimate reasons," and no factual allegations illustrate any definition of the term. Consequently, "legitimate reasons" is ambiguous because it is susceptible to more than one understanding. *Id*. The School District maintains that "legitimate reasons" encompasses budget concerns. ECF 9 at 13. While this assertion may be correct, the Court cannot at this stage make that determination, and dismissal of the breach of contract claim on the grounds of legitimate reasons is not warranted. Although the Court may interpret the CBA as a matter of law, the ambiguity of "legitimate reasons" precludes it from doing so. *East Ridge*, 109 P.3d at 974. As such, deciding whether Dunning's termination arose out of legitimate reasons is a question that is inappropriate for a resolution on a motion to dismiss.

Finally, Dunning includes in her breach of contract claim that the School District "could have transferred Dunning into a different position instead of terminating her employment." ECF 1

at 10. The Complaint states Conner did not contact her regarding the open positions throughout the year either. *Id*. at 9. The CBA states at provision 11-2 that the School District will "make every effort to place an employee recommended for reduction in an open position within the [School] District for which the employee is qualified." ECF 9-1 at 27. The CBA explains a reduction in force requires at least four people be terminated. *Id*. at 8. Because that did not happen here, Dunning's termination was not a reduction in force and the transfer provisions are inapplicable pursuant to the CBA's language. Moreover, the language of the transfer provision is permissible, not mandatory. Dunning has not adequately pleaded how the School District's discretionary decision to not transfer her would constitute a breach of contract.

## II.    Due Process Claims

"The Due Process Clause of the Fourteenth Amendment prohibits states from depriving 'any person of life, liberty, or property, without due process of law.'" *Doe v. Univ. of Denver*, No. 17-cv-01962-PAB-KMT, 2019 WL 3943858, at *10 (D. Colo. Aug. 20, 2019) (quoting U.S. Const. amend. XIV, § 1), *reversed on other grounds*, 1 F.4th 822 (10th Cir. 2021). "A court must 'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1163 (D. Colo. 2020) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (alterations in original). Courts must evaluate three factors in determining the procedural protections required: (1) the interests of the individual in retaining his or her property and the injury threatened by the official action; (2) the risk of error through the procedures used and the probable value, if any, of

additional or substitute procedural safeguards; and (3) the costs and administrative burden of the additional process, and the interest of the government in efficient adjudication. *Messeri*, 480 F. Supp. 3d at 1163 (citing *Mathews*, 424 U.S. at 335); see also *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) (noting with approval the use of the *Mathews* factors).

The Complaint focuses the alleged constitutional violation on essentially two actions by Defendants: (1) Dunning was not given notice; and (2) there was not an opportunity to be heard.

A.  **Individual Capacity Claim**

Conner argues he enjoys qualified immunity as Dunning fails to allege plausible procedural due process violations. Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "It is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id*. Qualified immunity is designed to shield public officials and ensure "that erroneous suits do not even go to trial." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow*, 457 U.S. at 806-08 (1982); *Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988)). Therefore, courts should address the qualified immunity defense at the earliest possible stage in litigation. *Medina v. Cram*, 252 F.3d 1124, 1127-28 (10th Cir. 2001); *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

The Tenth Circuit has advised that dispositive motions based on qualified immunity are treated differently than other dispositive motions. *See Farrell v. Montoya*, 878 F.3d 933, 936–37 (10th Cir. 2017). "After a defendant asserts a qualified-immunity defense, the plaintiff must meet

the 'heavy two-part burden' of showing that '(1) a reasonable jury could find facts supporting a violation of a constitutional right, [and] (2) [the constitutional right] was clearly established at the time of the defendant's conduct.'" *Id*. (quoting *Medina*, 252 F.3d at 1128 and *Gutierrez v. Cobos*, 841 F.3d 895, 900-01(10th Cir. 2016)). "In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id*. (quoting *Gutierrez*, 841 F.3d at 900).

"The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). The Supreme Court affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 232-35; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009). Here, the Court begins by examining the first prong.

Dunning alleges that she was not given adequate due process before being terminated. ECF 1 at 10. "Where the government has deprived an individual of a protected interest, we must weigh the following factors to determine whether that individual received due process: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *McDonald v. Wise*, 769 F.3d 1202, 1213 (quoting *Mathews*, 424 U.S. at 333). "The only

12

question is the level of process to which he was entitled to protect that property interest." *Riggins*, 572 F.3d at 1108. The level of process may be sufficient even when there is only "a limited conversation between an employee and his supervisor immediately prior to the employee's termination." *Id*. (citing *Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir.1989)). The Tenth Circuit has held that "pretermination warnings and an opportunity for a face-to-face meeting with supervisors, . . . and a conversation between an employee and his supervisor immediately prior to the employee's termination, were sufficient to satisfy constitutional requirements. *West v. Grand Cty.*, 967 F.2d 362, 367 (10th Cir. 1992); *see Seibert v. State of Okla., ex rel. the Univ. of Okla. Health Sciences Ctr.*, 867 F.2d 591, 598 (10th Cir. 1989); *see Powell*, 891 F.2d at 1459.

Further, the Tenth Circuit has explained that pretermination hearings need not be formal when there is an expectation of a post-termination hearing. *West.*, 967 F.2d at 367 (quoting *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)). These hearings are not required to resolve the issues with the termination. *Id*. Pretermination hearings need only serve as "a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46. In *West*, the plaintiff brought a claim for being terminated without cause and due process, contrary to the requirements from her work agreement. *West*, 967 F.2d at 364-65 (noting that the agreement stated that she could only be terminated for cause). The court explained that the plaintiff was entitled to due process, but only needed to be afforded an amount appropriate to her property interest. *Id*. at 367. There, the plaintiff was fired erroneously, but not due to disciplinary reasons. *Id*. The plaintiff had discussions and meetings to determine her employment rights. *Id*. at 368. She was first notified of her termination in a face-to-face meeting and was formally terminated about seven weeks later. *West v. Grand Cnty.*, No. 87–C–0942–S., 1990 WL 358304, at *2 (D. Utah Mar. 2, 1990). The

Tenth Circuit found those discussions to be sufficient hearings for providing adequate due process. *West*, 967 F.2d at 368 ("A brief face-to-face meeting with a supervisor provides sufficient notice and opportunity to respond to satisfy the pretermination due process requirements of *Loudermill*.") (quoting *Powell*, 891 F.2d at 1459).

In this case, Dunning's Complaint establishes she had an opportunity to be heard. As pleaded, Conner conducted a face-to-face meeting with Dunning to notify her. During this meeting, she could have made her concerns heard. Conner provided an official notice letter which states that "[i]f you have any questions, please contact . . . Manager of Employment Services." ECF 9-2. The School District and Dunning participated in all three grievance proceedings, and the termination decision was formally approved by the Board the next month. This is similar to the plaintiff in *West*, as both Dunning and that plaintiff had ample time and chances to make their concerns known. "'All that is necessary' to satisfy due process 'is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Watson*, 242 F.3d at 1241 (quoting *Mathews*, 424 U.S. at 349).

Finally, unlike the plaintiff from *West*, Dunning could be fired without just cause for the reasons explained by the Court in its breach of contract analysis. There, the plaintiff could only be terminated for cause as her work agreement required. *West*, 967 F.2d at 364. In the present case, the Article 10 provisions applied only to disciplinary actions, and Dunning's termination had nothing to do with her performance or violation of School District rules. The Court finds the pleading does not support a plausible claim for due process violations, and therefore Conner enjoys qualified immunity.

### B.  Monell Claim

"[T]o prove a § 1983 claim against a municipality, a plaintiff must show the existence of a municipal policy or custom which directly caused the alleged injury." *Davis v. Unified Sch. Dist. No. 512*, 799 F. App'x 566, 570 (10th Cir. 2019) (quoting *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017)). "An unconstitutional deprivation is caused by a municipal 'policy' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." *Marshall v. Columbia Lea Reg. Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003).

To establish the first requirement, a plaintiff may show a municipal policy or custom in the form of any of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188–89 (10th Cir. 2010)) (internal quotations omitted).

Dunning alleges that Conner was delegated "the authority to establish final employment policy." ECF 1 at 11. To determine whether an individual has final policymaking authority, the Tenth Circuit has directed courts to consider "the legal chain of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995). Courts must analyze (1) whether the official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final—i.e., are they subject to any meaningful review; and (3) whether the policy

decision purportedly made by the official is within the realm of the official's grant of authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Ware v. Unified School Dist.*, 902 F.2d 815, 818 (10th Cir. 1990) ("Delegation does not occur when a subordinate's decisions are constrained by policies not of his making or when those decisions are subject to review by the authorized policymaker.").

As explained in the Complaint, Conner's termination decision needed approval from the Board. ECF 1 at 2. Though Conner said she was going to be fired, the Board had to review this decision before it was finalized. This policy was "not of [Conner's] own making" and it was "subject to [] meaningful review" by the Board. *Praprotnik*, 485 U.S. at 127. Conner was not free to terminate Dunning without the approval of the Board. Therefore, Dunning fails to allege Section 1983 liability attaches to the School District because she has not plausibly plead a Monell claim.

### III. Leave to Amend

"In dismissing a complaint for failure to state a claim, the court should grant leave to amend freely 'if it appears at all possible that the plaintiff can correct the defect.'" *Triplett v. LeFlore Cty., Okla.*, 712 F.2d 444, 446 (10th Cir. 1983) (quoting 3 Moore's Federal Practice, ₱ 15.10 & n. 2 (1983)). However, "[a]t least outside of the pro se context, when a litigant fails to put the district court on adequate notice—in a legally cognizable manner—of his request for leave to amend, then the district court will not be faulted for failing to grant leave to amend." *Doe v. Heil*, 533 F. App'x 831, 847 (10th Cir. 2013).

Here, the Court is dismissing the Section 1983 claims against both Defendants. Dunning is represented by counsel, but has not requested, through motion or otherwise, leave to amend. It would be within this Court's discretion to refuse to grant leave to amend *sua sponte*. *Id*. ("[W]e will not upset the district court's dismissal with prejudice on the grounds that it failed *sua sponte*

16

to give a [plaintiff]—who was represented by counsel—an opportunity to file an amended complaint."); *see Burger King Corp. v. Weaver*, 169 F.3d 1310, 1318 (11th Cir. 1999) ("Although leave to amend should be liberally granted, a trial court is not required to *sua sponte* grant leave to amend prior to making its decision [to dismiss]."). However, given Dunning has not had an opportunity to amend, the Court cannot, at this point, find that permitting amendment certainly would prove futile. Therefore, the Court is dismissing the Section 1983 claims without prejudice, with leave to file, if she so chooses, an amended complaint no later than fourteen days from the issuance of this Order.

## CONCLUSION

ACCORDINGLY, Defendant's Motion [filed May 20, 2022; ECF 9] is **granted in part and denied in part**. Dunning's Section 1983 claims are dismissed without prejudice, with leave to file an amended pleading no later than fourteen days from the date of this Order. Finally, the breach of contract claim survives only as to the "legitimate reasons" provision.

Entered and dated this 9th day of August, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge